IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WILLIAM C. KIMBLE, JR.,

               Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 16-04448 (JBS)

**OPINION**

APPEARANCES:

Steven Hordis, Esq.
102 Browning Lane
Cherry Hill, NJ 08003
    Attorney for Plaintiff William Kimble, Jr.

Heather Benderson, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel, Region III
P.O. Box 41777
Philadelphia, PA 19101
    Attorney for Defendant Commissioner of Social Security

**SIMANDLE**, District Judge:

## I. INTRODUCTION

    This matter comes before the Court pursuant to 42 U.S.C. §
405(g) for review of the final decision of the Commissioner of
the Social Security Administration denying Plaintiff William
Kimble's applications for disability benefits and supplemental
security benefits under Title II and Title XVI of the Social
Security Act, 42 U.S.C. § 401, et seq. Plaintiff, who suffers

from status-post left shoulder rotator cuff surgery, status-post right shoulder rotator cuff surgery, an intellectual/learning disability, hearing loss and degenerative disc disease of the lumbar spine was denied benefits for the period beginning December 27, 2011, the alleged onset date of disability, to January 7, 2016, the date on which the Administrative Law Judge ("ALJ") issued a written decision.

In the pending appeal, Plaintiff argues that the ALJ's decision must be reversed and remanded on four grounds. Plaintiff contends that the ALJ erred in (1) determining at step three that Plaintiff did not meet Listing 12.05C; (2) finding that Plaintiff lacked sufficient credibility; (3) failing to accord proper weight to the Third Party Function Report of Plaintiff's wife; and (4) according "great weight" to the consultative report of Dr. William Dennis Coffey. For the reasons stated below, this Court finds that substantial evidence supports the ALJ's determinations, and will affirm the ALJ's decision denying Plaintiff disability benefits and supplemental security benefits.

## II. BACKGROUND

### A. Procedural History

Plaintiff William Kimble filed an application for disability insurance benefits on April 23, 2013. (R. at 140.) Plaintiff also filed an application for supplemental security

benefits on July 30, 2013. (R. at 141.) In both applications, Plaintiff alleged an onset of disability as of December 27, 2011. (R at 141-42.) On November 12, 2013, the Social Security Administration ("SSA") denied these claims, and upon reconsideration on April 15, 2014. (R. at 20.) A hearing was held on December 1, 2015 before ALJ Karen Shelton, at which Plaintiff appeared with counsel and testified. (Id.) On January 7, 2016 the ALJ issued a written decision finding that Plaintiff was not disabled (R. at 32.) On May 20, 2016, the Appeals Council denied Plaintiff's request for a review, and Plaintiff timely filed the instant action. (R. at 1-7.)

**B. Medical History**

The following are facts relevant to the present motion. Plaintiff was 44 years old as of the date of the ALJ Decision. Plaintiff graduated from high school and obtained vocational training as a cook at the Burlington County Special Services. Plaintiff had work experience as a cook, a gas attendant, a housekeeper, and a factory operations worker. (R. at 58-59.)

**1. Physical Impairments**

Plaintiff filed a claim for disability insurance benefits and supplemental security benefits, alleging that he suffered from disability due to status-post left shoulder rotator cuff surgery, status-post right shoulder rotator cuff surgery, an

intellectual/learning disability, hearing loss and degenerative disc disease of the lumbar spine (R. at 43.)

Plaintiff's medical records commence with a December 2011 report that indicates that Plaintiff's family physician, Dr. Kennedy Ganti, ordered that an ADX 2105 - Spine Lumbosacral procedure be performed on Plaintiff. (R. at 351.) The resulting report indicated a finding of degenerative disc disease at L5-S1 of the lumbar spine. (Id.) The report also indicated that Plaintiff's intervertebral disc space levels were maintained in height; that his facet joints were intact; and, that there was no destructive osseous pathology. (R. at 352.) In November 2012, Plaintiff underwent a physical examination, performed by Dr. Ronald Bagner (R. at 361.) Dr. Bagner noted that Plaintiff claimed that he sustained injury to his lower back in December of 2011 while working as a machine operator. Plaintiff complained of difficulty bending, which caused the pain to radiate up to the mid-back. (Id.) Plaintiff stated that he had an MRI in January of 2012, but had not seen a physician or received medicine for back pain since then. (Id.) Plaintiff also informed Dr. Bagner that he fractured both clavicles years prior. (Id.)

Throughout the Physical Examination, Dr. Bagner observed that Plaintiff ambulated without difficulty, got on and off the examining table without difficulty, and dressed and undressed

4

without assistance. (Id.) Moreover, Plaintiff did not display
any discomfort while in the seated position throughout the
examination. (Id.) Dr. Bagner noted that Plaintiff's upper
extremities, including his shoulders, elbows, forearms, wrists,
and fingers showed a normal range of movement. (Id.) With regard
to Plaintiff's back, Dr. Bagner observed that Plaintiff
possessed 0-90 degrees of flexion, yet Plaintiff experienced
pain on movement of the lower back. (Id.) Dr. Bagner's overall
impression was that Plaintiff suffered from a Lumbosacral
strain. (R. at 365.)

    In November 2012, Plaintiff underwent a LS Spine Film,
conducted by Dr. Samuel Wilchfort. (R. at 366). Dr. Wilchfort
recorded that the LS Spine Film indicated normal "alignment,
vertebral heights," but also showed moderate narrowing of L5-S1
of the lumbar spine. (Id.) No other abnormalities were noted.
(Id.)

    In April 2013, Plaintiff was examined by Dr. Asha
Vijayakumar for a complaint of "dislocating arm and torn
ligaments." (R. at 367.) Plaintiff informed Dr. Vijayakumar that
he had experienced recurrent shoulder dislocation since being
the victim of a mugging at age 18. (Id.) Plaintiff informed the
doctor that the shoulder pain interfered with his sleep and his
activity. (Id.) Dr. Vijayakumar noted that Plaintiff experienced
shoulder joint pain that gradually worsened as Plaintiff

attempted to raise his shoulders. (Id.) Dr. Vijayakumar ordered that Plaintiff follow up in one month, to consult with an Orthopedic Surgeon, to wear a sling as needed and to take Motrin for pain. (R. at 368.)

Plaintiff's follow-up appointment took place on May 24, 2013. (R. at 369.) Dr. Wayne Shaw performed the examination on this date. (Id.) Dr. Shaw noted that Plaintiff was not able to visit an orthopedist because his appointment was rescheduled. (Id.) Plaintiff also reported that he had a broken arm at that time, which was in a sling. (Id.) Dr. Shaw ordered that Plaintiff follow up in two months, to consult an Orthopedic Surgeon, and to take Tramadol for pain. (Id.)

In August 2013, Plaintiff's left shoulder was examined by Dr. Sean McMillan of Lourdes Medical Associates Professional Orthopaedics. (R. at 391.) Examination of the left shoulder revealed that Plaintiff had range of motion from 0 to 140 degrees overhead, which is about 10 degrees shy of the contralateral side. (R. at 391.) Dr. McMillan noted that Plaintiff experienced pain when making such motion. Plaintiff's internal rotation was to his chest wall, and external rotation was about 25 degrees. (Id.) Abduction was from 0 to 80 degrees. Plaintiff had negative sulcus sign, and experienced pain with Jobe relocation testing. (Id.) Dr. McMillan noted that Plaintiff had a 4/5 rotator cuff strength. (Id.) Lastly, Dr. McMillan

noted that Plaintiff had negative impingement and positive bicipital groove pain. (Id.) Dr. McMillan's assessment was not certain that Plaintiff was experiencing "true dislocation." (Id.) An MRI of Plaintiff's left shoulder was prescribed in order to make this determination. (Id.)

In September 2013, following the MRI, Dr. Mc Millan informed Plaintiff that he had a left shoulder ALPSA lesion, as well as a SLAP tear and sub-acromial impingement. (Id.) After discussing the pros and cons of surgery with Dr. McMillan, Plaintiff was scheduled for surgery to repair his left shoulder. (R. at 390.) On September 23, 2013, Dr. Ronald Bagner performed his second examination of Plaintiff. (R. at 372.) Dr. Bagner, again, noted Plaintiff's claim of dislocation of the left shoulder and the pain caused by movement of the left shoulder. (Id.) However, Dr. Bagner noted that Plaintiff was scheduled for surgery to repair the left shoulder in four days from the date of the examination. (Id.) Plaintiff's left shoulder showed 0-70 degrees forward elevation, 0-70 degrees of abduction, 0-50 degrees internal rotation and normal external rotation. (Id.) Plaintiff's right shoulder showed a normal range of motion. (Id.) Notably, Dr. Bagner, again, noted that Plaintiff was able to ambulate, get on and off the examining table, and get dressed and undressed without any assistance or difficulty. (R. at 373.)

Plaintiff was also examined by Dr. Stephen Toder on September 23, 2013. (R. at 376.) Dr. Toder opined that Plaintiff's left shoulder was intact, that there existed no fracture or dislocation, and that there was minimal degenerative change. (Id.)

In September 2013, Dr. McMillan performed a surgical arthroscopy of Plaintiff's left shoulder, which consisted of a SLAP repair and a biceps tenodesis. Thereafter, in October 2013, Plaintiff returned to Lourdes Medical Associates Professional Orthopaedics for a post-surgery follow-up appointment. Dr. Danielle Thorn examined Plaintiff's left shoulder and noted bruising and swelling that was consistent with the surgery. (R. at 387.) Dr. Thorn also noted that Plaintiff was to begin physical therapy. (Id.)

In November 2013, Plaintiff told Dr. McMillan that he believed that he re-tore his biceps tendon while changing a flat tire for his wife. (R. at 385.) Dr. McMillan noted that Plaintiff had a "biceps tendon, which [was] sunken down somewhat distally." (Id.) Dr. McMillan believed that this may have indicated a rupture versus incompetence due to healing. (Id.) Although Dr. McMillan was not certain as to whether Plaintiff's bicep was torn, he informed that it was an acceptable form of treatment modality and insisted that Plaintiff continue

treatment. (Id.) Plaintiff was given a corticosteroid injection for pain. (R. 386.)

In December 2013, Plaintiff was again examined by Dr. Thorn for status post left shoulder athroscopic SLAP repair, bicep tendesis and subacromial decompression. (R. at 383.) Plaintiff continued to complain of pain when performing overhead activity, but his range of motion had improved. (Id.) Dr. Thorn suggested that Plaintiff continue physical therapy. (Id.)

On December 18, 2013, an Appeal Disability Report was filed on Plaintiff's behalf by his sister, Cynthia Vassey. (R. at 306-311.) The report indicated that the Plaintiff could barely lift his left arm, as he reportedly "slipped on black ice and injured [his] arm even worse." (Id. at 306.) Additionally, the report indicated that Plaintiff's right arm was worsening as well. (Id.) The approximate date of the Plaintiff's changed conditions was listed for September 2013. (Id.)

From October 2013 to January 2014, Plaintiff attended physical therapy for his left shoulder for three days per week for a total of 25 sessions. (R. at 393-406.)

In January 2014, Plaintiff informed Dr. McMillan that, on January 2, 2014, he had a slip and fall and landed on his left shoulder. (R. at 429.) The apparent discrepancy in dates of his falling accident are unexplained, namely, September 2013, according to his sister's ADR (R. at 306.), supra, and his

statement to Dr. McMillan that he fell on January 2, 2014 (R, at 429.). Additionally, Plaintiff informed Dr. McMillan that he believed that his right shoulder had "popped on him," stating that his right shoulder had become extremely painful following the January 2, 2014 slip and fall. (Id.) However, an MRI performed on the day of the slip and fall revealed no evidence of acute fracture or dislocation. (R. at 492.) During the physical examination of Plaintiff, Dr. McMillan noted that Plaintiff possessed a range of motion of the right shoulder of 0 to 130 degrees, with the left shoulder's range of motion at 0 to 110 degrees. (Id.) Dr. McMillan also noted that Plaintiff had tenderness to palpation at both shoulders and some periscapular atrophy on the right shoulder. (Id.) Ultimately, Dr. McMillan gave Plaintiff corticosteroid injections in both shoulders for pain and decided that Plaintiff was to suspend physical therapy for two weeks. (R. at 430.)

On January 29, 2014, Plaintiff's wife filed an additional Adult Function Report on his behalf. (R. at 312-19.) The report indicated that, due to the worsening of his shoulders, Plaintiff required assistance with dressing and grooming himself. (Id.) The report also indicated that Plaintiff could no longer perform yard or housework. (Id.) Plaintiff's wife also reported, however, that he pursued hobbies and interest including hunting and fishing. (R. at 315.)

In February 2014, Plaintiff informed Dr. McMillan that he
believed that his shoulder "popped out" the week prior. (R. at
427.) During the examination, Dr. McMillan noted that Plaintiff
possessed a range of motion of the left shoulder of 0 to 140
degrees and about 110 degrees with abduction. (Id.) Plaintiff's
right shoulder demonstrated a range of motion from 0 to 140
degrees with discomfort. (Id.) Dr. McMillan also noted that
Plaintiff's right shoulder had some dimpling about the
posterior, which Dr. McMillan believed to indicate posterior
rotator cuff atrophy. (Id.) Plaintiff was provided a card for
Rainbow Rehab Physical Therapy in order for him to continue
working on his range of motion. (R. at 428.)

In March 2014, Plaintiff complained that pain in both of
his shoulders rendered him unable to return to work and unable
to complete simple house tasks, such as taking out the trash.
(R. at 475.) Nevertheless, Plaintiff reported that his right
shoulder was beginning to feel better. (Id.)  The physical
examination of Plaintiff indicated a range of motion of the left
shoulder from 0 to 150 degrees overhead and abduction at 0 to
120 degrees. (Id.) The right shoulder remained at 0 to 140
degrees with discomfort and abduction at 0 to 120 degrees. (Id.)
Again, Dr. McMillan noted that he did not believe that there was
any true evidence of apprehension or instability within the
right shoulder. (Id.) With regard to the left shoulder, Dr.

McMillan noted that the repairs that were done had healed. (Id.)
To address Plaintiff's complaint of weakness of his left
shoulder, Dr. McMillan set forth a plan to begin a "work
hardening" program. (Id.) Were the weakness to persist, Dr.
McMillan considered ordering an EMG versus a cervical MRI to
determine whether there was a cervical component to the
weakness. (Id.)

In October 2014, Plaintiff, again, complained to Dr.
McMillan of "unrelenting" pain in both shoulders and expressed
his belief that his left shoulder was popping out. (R. at 473.)
After evaluating an X-Ray of both shoulders, Dr. McMillan
determined that there was no evidence of fracture or dislocation
in either shoulder. (R. at 474.) However, Dr. McMillan ordered a
repeat MRI to determine the exact etiology of Plaintiff's
instability. (Id.) Plaintiff was also directed to continue
physical therapy and the use of an arm sling. (Id.)

Progress notes from Dr. McMillan indicate that Plaintiff
reported complaints of pain in both shoulders during multiple
visits throughout 2015. (R. at 458-62.)

In June 2015, Plaintiff informed Dr. McMillan of three
subluxation or dislocation events, which rendered Plaintiff
unable to fulfill the obligation of lifting 50 pounds or more at
his Post Office job. (R. at 471-72.) Dr. McMillan ordered

another MRI and suggested that Plaintiff refrain from heavy lifting. (Id.)

In July 2015, an MRI revealed mild rotator cuff tendinosis and mild subacromial subdeltoid bursitis of Plaintiff's right shoulder. Thereafter, in September 2015, Plaintiff underwent a right shoulder arthroscopic biceps tenodesis, distal clavicle excision, subacromial decompression and extensive rotator cuff and labral debridement. (R. at 478.)  Following the surgical procedure, Mr. McMillan prescribed a right arm sling, pain medication and physical therapy. (R. at 468.) Plaintiff attended physical therapy on September 18, 2015, October 9, 2015 and November 16, 2015. (R. at 498-502.)

In October 2015, Dr. McMillan discontinued the use of an arm sling, prescribed anti-inflammatory cream and ordered that Plaintiff continue physical therapy. (R. at 465.) Plaintiff's final visit to Dr. McMillan to precede the disability hearing took place on November 16, 2015. (R. at 463.) During this visit, Plaintiff noted that he was "doing okay," but felt as if his shoulder "popped out" during physical therapy that day. (Id.) Dr. McMillan noted that it did not look as if his shoulder was dislocated at all. (Id.) Dr. McMillan put Plaintiff's right arm back into a sling, prescribed anti-inflammatory cream and ordered that Plaintiff continue physical therapy. (R. at 464.)

### 2. Mental Impairment

In May 2012, Dr. Kenneth Goldberg performed a psychological evaluation of Plaintiff at the request of the Division of Vocational Rehabilitation (hereinafter, "DVR"). (R. at 355.) Dr. Goldberg's subsequent report indicated that Plaintiff claimed to have a learning disability and that he read poorly. (Id.) Plaintiff informed Dr. Goldberg that he was terminated from his most recent job because of DYFS requirements that caused Plaintiff to take too much time off from work. (R. at 356) Dr. Goldberg's testing included Intelligence Testing, Achievement Tests and Personality Test. (Id.) According to the report, Plaintiff tested in the mildly mentally deficient range of intellectual functioning with a Full Scale IQ score of 66 and a General Ability score of 61. (Id.) However, Plaintiff's attained a score of 94 in the area of Processing Speed, an area of strength that Dr. Goldberg considered to be a good sign for work potential at Plaintiff's level of intellectual functioning. (Id.) In the Achievement Tests, Plaintiff tested at a 1.1 reading grade level and at a 2.5 math grade level. With regard to the Personality Tests, Dr. McMillan noted that Plaintiff seemed frustrated, but did not display any other signs or symptoms of psychopathology. (Id.) Moreover, Dr. Goldberg noted that Plaintiff failed to comprehend instructions for the DAP. (R. at 357.)

Notably, Dr. Goldberg reported that Plaintiff informed him that he was on the verge of getting a job, as he was awaiting a background check. (R. at 358.) Yet, Dr. Goldberg later noted that "between [Plaintiff's] IQ and reading scores, he may meet the formal qualifications used by the Social Security Administration in determining disability." (Id.) Dr. Goldberg's overall conclusion consisted of the following: that Plaintiff tested in the mildly mentally deficient range, yet his strong processing speed was a good sign for work; that Plaintiff was essentially illiterate; and, that Plaintiff was capable of handling work involving general labor. (R. at 358-59.)

On Plaintiff's July 31, 2012 Adult Disability Report, Plaintiff indicated the medical condition that limited his ability to work was his "learning disability." (R. at 264-69.) Contrary to Plaintiff's prior assertions to Dr. Goldberg, Plaintiff reported that he stopped working because he "was terminated because [he] cannot read and write." (Id.)

In October 2013, Plaintiff underwent a mental status examination with Dr. William Dennis Coffey. (R. at 377-81.) Although Plaintiff required his wife's assistance in completing forms, Plaintiff had no difficulty following the topic of conversation or participating in the examination. (R. at 379.) Plaintiff displayed an ability to identify the president and former presidents, perform simple arithmetic and complete

various sequence testing. (Id.) Dr. Coffey opined that Plaintiff
did not appear to meet the criteria for a major mental disorder
that would interfere with his capacity to work. (R. at 380.) In
accordance with this opinion, Dr. Coffey made the following
findings: that Plaintiff possessed an adequate understanding and
memory, but limited concentration; that Plaintiff was able to
respond to changes in a normal routine and work independently;
that Plaintiff was capable of understanding and remembering
short, simple instructions and making simple work related
decisions; and that Plaintiff had the adequate ability to adapt
to changes in the work environment, handle work stress and
maintain social interaction. (Id.)

    In November 2013, as part of the Initial Determination, Dr.
Seymour Bortner examined Plaintiff and opined that Plaintiff's
mental disability rendered him mildly limited in activities of
daily living and social functioning and moderately limited in
concentration, persistence and pace. (R. at 107.) Yet, Plaintiff
displayed an ability to "understand/execute simple instructions,
make work related decisions, interact with others and adapt to
workplace change. (Id.) In April 2014, as part of the
Reconsideration Determination, Dr. Michael D'Adamo provided an
opinion that was largely consistent with that of Dr. Bortner's.
(R. at 119.) The only difference related to Dr. D'Adamo's
opinion that "Plaintiff's cognitive limitations restrict his

ability to adapt to rapid changes and to function independently on a job." However, Dr. D'Adamo concluded that "in real life [Plaintiff] functions at a higher level and has worked several jobs, maintaining them for stretches of time."

**C. ALJ Decision**

In a comprehensive written decision dated January 7, 2016 (R. at 20-32), ALJ Shelton found that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of the decision because, "consistent with his age, education, work experience, and RFC, he was capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 32.) In accordance with her determination, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016. (R. at 22.)

2. Plaintiff has not engaged in substantial gainful activity since December 27, 2011, the alleged onset date (20 CFR 404.1571 et seq. and 416.971 et seq.). (Id.)

3. Plaintiff had the following severe impairments: status-post left shoulder rotator cuff surgery; status-post right shoulder rotator cuff surgery; and intellectual

disability (20 CFR 404.1520(c) and 416.920(c).). (R. at 22-23)

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404m Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926). (R. at 23-25.)

5. Plaintiff has the RFC to lift/carry up to 10 pounds; stand and walk for 6 of 8 hours and sit for 6 of 8 hours; occasionally push/pull with both upper extremities; occasionally reach in the front or on the side at desk level, but never reach overhead bilaterally; never crawl or climb ladders, ropes or scaffolds; and must avoid unprotected heights or hazards. Additionally, Plaintiff is limited to simple instructions and work decisions; can only concentrate for 2 hours before needing a break; and requires a routine environment with infrequent changes. (R. at 25-30.)

6. Plaintiff is unable to perform any past relevant work (20 CFR 404.1565 and 416.965). (R. at 30-31.)

7. Plaintiff was born on October 12, 1971 and was 40 years old, which is defined as a younger individual age 18-44,

on the alleged disability onset date (20 CFR 404.1564 and 416.963). (R. at 31)

8. Plaintiff is illiterate, but is able to communicate in English (20 CFR 404.1564 and 416.964). (Id.)

9. Transferability of job skills is not an issue in this case because the Plaintiff's past relevant work is unskilled (20 CFR 404.1568 and 416.968). (Id.)

10. Considering the Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform (20 CFR 404.1569, 404.1569(a) and 416.969(a)). (R. at 31-32.)

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from December 27, 2011, through the date of the ALJ decision (20 CFR 404.1520(g) and 416.920(g)).

Despite recognizing Plaintiff's physical and mental impairments as severe (Finding 3), at step three of the sequential evaluation, the ALJ concluded that Plaintiff's impairments, did not meet or equal the severity of any impairment found in the Listing of Impairments set forth in 20 C.F.R. Part 404, and specifically, listings 1.02 and 12.05. (R. at 32.) In support of this finding, the ALJ noted that, "no medical expert [had] concluded that the [Plaintiff's]

impairments meet or equal to a listed impairment." (Id.)
Regarding the injuries to Plaintiff's shoulders, the ALJ
determined that the injuries, "[did] not interfere with
[Plaintiff's] ability to perform gross and fine motor movements
effectively." (Id.) The ALJ further noted that Plaintiff was
able to "ambulate effectively, as that term is defined in
Section 1.00B2b." (Id.)

The ALJ then considered Plaintiff's mental impairment under
the requirements of listing 12.05, ultimately, determining that
there was no evidence to support a finding of sub-average
general intellectual functioning with deficits in adaptive
functioning manifested during Plaintiff's developmental period.
(R. at 24.) In making this determination, the ALJ evaluated
Plaintiff's testimony, Plaintiff's Initial Determination
reports, psychological evaluations performed by Dr. Goldberg and
Dr. Coffey, Plaintiff's Disability Report and Plaintiff's
Function Report. (Id.) The ALJ noted that Plaintiff's "gainful
employment history," which indicated that Plaintiff possessed
the mental capability to work prior to his alleged onset date.
(Id.) Also, the ALJ highlighted Dr. D'Adamo and Dr. Goldberg's
observations that suggested that, despite Plaintiff's relatively
low aptitude and achievement testing, Plaintiff possessed a
strong processing speed that allowed Plaintiff to function at a
high level in real life. (Id.) Accordingly, the ALJ adopted the

observation of Dr. Goldberg, which suggested that Plaintiff's
strong processing speed was a "very positive sign that someone
with Plaintiff's limitations could hold a job." (Id.)

With respect to Plaintiff's dependency upon others and
ability to follow directions, the ALJ noted that Plaintiff
indicated that his ability to attend to his personal care
without difficulty and follow spoken directions very well. (Id.)
Although the ALJ acknowledged Plaintiff's relatively low full
scale IQ of 66, an evaluation of Plaintiff's Function Report and
Psychological Evaluation revealed that Plaintiff's mental
disability presented mere mild/moderate difficulties, as the
Plaintiff had the ability to assist with light household chores,
make simple meals, maintain friendships and engage in various
social activities with his friends and family. (R. at 25.)

In making a determination as to Plaintiff's RFC (Finding
5), the ALJ provided a thorough analysis of, inter alia,
Plaintiff's testimony, Plaintiff's extensive medical records,
Plaintiff's Initial Determination and Plaintiff's
Reconsideration Determination. (R. at 25-30.) Although the ALJ
found that Plaintiff's physical and mental impairments could
reasonably be expected to cause the alleged symptoms, he found
Plaintiff's statements concerning the intensity, persistence,
and limiting effects of those symptoms to lack sufficient
credibility. (R. at 26, 30.) The ALJ noted a number of perceived

discrepancies between Plaintiff's assertions, testimony and the medical record, including: Plaintiff's conflicting reasons as to why he was terminated from his job, Plaintiff's inconsistent statements regarding whether he possessed a driver's license and Plaintiff's inconsistent statements regarding his physical and mental impairments. (R. 26-30.) For similar reasons, the ALJ found the Third-Party Function Report of Plaintiff's wife to be unpersuasive, as it merely corroborated Plaintiff's claims, which the ALJ determined to be outweighed by the medical evidence. (R. at 30.)

Ultimately, after adopting the Vocational Expert's testimony, the ALJ determined that, "consistent with his age, education, work experience, and RFC, he was capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 32.)

## III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). Remand is not required where it would not affect the outcome of the case. Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

## IV. DISCUSSION

### A. Legal standard for determination of disability

In order to establish a disability for the purpose of disability insurance benefits, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Plummer v. Apfel, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the ability to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Plummer, 186 F.3d at 427–428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." 20 C.F.R. § 1520(b). Present engagement in substantial activity precludes an award of disability benefits. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment."  20 C.F.R. § 1520(c).  Impairments lacking sufficient severity render the claimant ineligible for disability benefits.  See Plummer, 186 F.3d at 428.  Step three requires the Commissioner to compare medical evidence of the claimant's impairment to the list of impairments presumptively severe enough to preclude any gainful activity.  20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant's impairments render the claimant unable to return to the

claimant's prior occupation, the ALJ will consider whether the claimant possesses the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity (RFC), age, education, and work experience. 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

## B. Substantial evidence supports the ALJ's determination that Plaintiff's mental disability did not meet Listing 12.05C

At step three, the ALJ concluded that Plaintiff's intellectual impairment failed to meet or equal section 12.05 of the Listing of Impairments because "there is nothing in the record to support deficits in adaptive functioning initially manifested during the developmental period, namely prior to age 22." (R. at 24.)

Plaintiff contends that the ALJ misconstrued the requirements of Listing 12.05C as requiring Plaintiff to have been unable to work prior to the alleged onset date, requiring an inability to be trained to perform simple tasks or count basic change and requiring that the additional severe impairment to have had an onset prior to age 22. (Pl.'s Br. at 20.) Further, Plaintiff argues that the ALJ "erroneously equated 'adaptive functioning' with the ability to work." (Id. at 21.) Defendant counters, however, that Plaintiff merely "misunderstands the ALJ's findings" that led to its determination that Plaintiff's intellectual impairment failed to

meet or equal section 12.05 of the Listing of Impairments.

(Def.'s Opp'n at 5.)

Listing 12.05 provides, in relevant part, that

> Intellectual disability refers to significantly
> subaverage general intellectual functioning with
> deficits in adaptive functioning initially
> manifested during the developmental period; i.e.,
> the evidence demonstrates or supports onset of
> the impairment before age 22.

(Id.) In order to meet or equal the Listing, however, the

plaintiff must meet both the introductory criteria, requiring

"significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested [before

age 22]," and, as relevant here, the criteria of subpart C. See

Gist v. Barnhart, 67 F. App'x. 78, 81 (3d Cir. 2003) ("[a]s is

true in regard to any 12.05 listing, before demonstrating the

specific requirements of Listing 12.05(C), a claimant must show

proof of a 'deficit in adaptive functioning' with an initial

onset prior to age 22."); Cortes v. Comm'r of Soc. Sec., 255 F.

App'x. 646, 651 (3d Cir. 2007).

Subpart 12.05(C), in turn, requires the plaintiff to

demonstrate a "valid verbal, performance, or full scale IQ of 60

through 70 and a physical or other mental impairment imposing an

additional and significant work-related limitation of function."

20 C.F.R. pt. 404, subpt. P, app.1 (emphases added). In other

words, Plaintiff must establish "another impairment, in addition

26

to the [intellectual disability], that imposes an additional and significant work-related limitation of function." Williams v. Sullivan, 970 F.2d 1178, 1184 (3d Cir. 1992).

Thus, in order for Plaintiff to meet listing 12.05C, Plaintiff must demonstrate (1) an intellectual disability, i.e., significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; (2) a valid verbal, performance, or full scale I.Q. in the range of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. See 20 C.F.R. pt. 404, subpt. P, app.1.

The Third Circuit has held that the claimant bears the burden of establishing the existence of an intellectual disability during the developmental period. Cortes v. Comm'r of Soc. Sec., 255 F. App'x 646, 652 (3d Cir. 2007) (citing Williams v. Sullivan, 970 F.2d 1178, 1185 (3d Cir. 1992)); Markle v. Barnhart, 324 F.3d 182, 188-89 (3d Cir. 2003). To satisfy this burden, "it is unnecessary to produce intellectual testing (or other contemporary evidence) prior to age 22. The claimant need only produce evidence that demonstrates or supports onset of the impairment before age 22." Cortes, 255 F. App'x at 652-53.

In this instance, the ALJ began her analysis under Listing 12.05 with the first prong of the above listed three-prong test,

determining that "there is nothing in the record to support deficits in adaptive functioning initially manifested during the developmental period, namely prior to age 22." (R. at 24.) The ALJ noted that Plaintiff failed to produce any evidence that he was in special education classes throughout his high school career. The ALJ also noted the psychological examinations performed by Dr. D'Adamo and Dr. Goldberg, which highlighted Plaintiff's ability to maintain gainful employment for much of his adult life. (Id.) Moreover, the ALJ noted that Plaintiff admitted that he could read some things, count change and that he received hands-on training to prepare food. (Id.)

Plaintiff challenges the ALJ's determination and argues that the ALJ "erroneously equated 'adaptive functioning' with the ability to work." (R. at 21.) Further, Plaintiff avers that, contrary to the ALJ's finding, Plaintiff did produce evidence to support his claim that he participated in special education classes. Accordingly, Plaintiff asserts that he offered sworn testimony and "provided the Social Security Administration with the precise contact information for the child study team and Burlington County Special Services, which would have the appropriate detail on his attendance in Special Education." (Pl.'s Reply Br. at 3.) The Court rejects these arguments for the reasons discussed below.

The Court finds that the ALJ did not err in determining
that "there is nothing in the record to support deficits in
adaptive functioning initially manifested during the
developmental period, namely prior to age 22." (R. at 24.) First
and foremost, Plaintiff's apparent suggestion that the ALJ
failed in her duty to develop the record by not contacting "the
child study team and the Burlington County Special Services" is
without merit. (Pl.'s Reply Br. at 20.) Rather, the Court finds
that Plaintiff failed to produce all relevant evidence to
support its argument that Plaintiff participated in special
education classes. Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir.
2001)(providing that an ALJ's duty to develop the record
coexists with a claimant's duty to present all relevant evidence
to the ALJ, and establish good cause for omitted evidence). This
evidence of special education classification, if it exists, was
readily available to Plaintiff and his attorney, yet there is no
indication that Plaintiff attempted to obtain and submit it to
the Social Security Administration for consideration. The Third
Circuit has recognized in a similar case in which the claimant
claimed to have been assigned to special education classes
through their time in school and produced no documentary
evidence of participating in a special education curriculum that
substantial evidence supported the ALJ's determination that
claimant failed to demonstrate she suffered from the requisite

deficits in adaptive functioning prior to age 22. See Gist v.
Barnhart, 67 F. App'x 78, 81-82 (3rd Cir. 2003). The only other
testimony that was offered on this issue was Plaintiff's
testimony and his wife's corroborating statements within the
Third Party Function Report, both of which the ALJ found to be
inconsistent with the evidence as a whole. (R. at 30.)

The Court further finds that the ALJ did not err by
considering the Plaintiff's gainful employment history, as the
regulations indicate, in the context of determining one's degree
of intellectual disability, "that an ability to hold a job is
particularly useful in determining the individual's ability or
inability to function in a work setting." Williams v. Sullivan,
970 F.2d 1178, 1185 (3d Cir. 1992) (quoting 20 C.F.R. Pt. 404,
Subpt. P, App. 1, § 12.00(D).) Additionally, the Court finds
that the ALJ did not solely rely on Plaintiff's gainful
employment history in making her determination. As
aforementioned, the ALJ also considered the fact that Plaintiff
graduated from high school and that he possessed a strong
processing speed, which allowed him to "function at a higher
level in real life." (R. at 24.) The ALJ further noted
Plaintiff's ability to assist with light household chores, make
simple meals, maintain friendships and engage in various social
activities with his friends and family. (R. at 25.)

The Court acknowledges that the ALJ's findings with respect to the last two prongs of the three-prong test are somewhat unclear. The ALJ stated that,

> [i]n terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

(R. at 24.) However, in the preceding sentence, the ALJ had explicitly noted Plaintiff's full scale IQ of 66. (Id.) Moreover, the ALJ specifically found that "[Plaintiff's] bilateral rotator cuff injuries are severe impairments." (Id.) Thus, the Court finds this discrepancy to be immaterial to its overall analysis.

For the aforementioned reasons, the Court finds that substantial evidence supports the ALJ's determination that "there is nothing in the record to support deficits in adaptive functioning initially manifested during the developmental period," as required by Listing 12.05C. (R. at 24.)

## C. Substantial evidence supports the ALJ's credibility findings

The ALJ found that Plaintiff had medically determinable impairments that could reasonably be expected to produce some symptoms. (R. at 30.) However, a review of the record, the ALJ found that Plaintiff's statements regarding his level of pain and inability to work were not credible, as they were

31

inconsistent with the medical evidence and with Plaintiff's own testimony. (R. at 30.)

"The extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of those statements." (Social Security Ruling 96-7.) When making credibility findings, the ALJ must indicate which evidence they reject and which they rely upon as the basis for their findings. See Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999). Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible. See Burns v. Barnhart, 312 F.3d 113, 129-30 (3d Cir. 2002). Moreover, allegations of pain and other subjective symptoms must be supported by objective medical evidence. See 20 C.F.R. § 404.1529; see also Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). Even "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible – the ALJ can choose to credit portions of the existing evidence." See Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 146 (3d Cir. 2007)(Quoting Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)).

Plaintiff challenges the ALJ's credibility determination,
arguing that the ALJ incorrectly considered Plaintiff's multiple
statements about his shoulder "popping out" and his doctor's
doubt that Plaintiff was experiencing "true dislocations" to be
a sign of untruthfulness. (Pl. Br. at 25; R. at 27-28.)
Plaintiff notes that Dr. McMillan stated that while he doubted
that Plaintiff was experiencing "true dislocations," Dr.
McMillan did state that "[Plaintiff] may be subluxing."
Plaintiff asserts that he was essentially discredited because of
his lack of medical expertise while describing the pain in his
shoulders. (Pl. Br. at 25.) Additionally, Plaintiff argues that
the ALJ incorrectly relied on contradictory statements regarding
Plaintiff's ability to maintain a driver's license, averring
that Dr. Coffey's assertion that Plaintiff produced a valid
driver's license is unsubstantiated. (R. at 26, 48, 379; Pl. Br.
at 26.)

The Court does not find Plaintiff's arguments to be
persuasive, as the ALJ highlighted various clear discrepancies
that are supported by the record, and which undermine
Plaintiff's credibility. Further, the Court finds that, in
making credibility findings, the ALJ properly indicated which
evidence she rejected and which she relied upon as the basis for
her findings. See Schaudeck, supra, at 433. As previously
mentioned, a careful review of the ALJ's detailed analysis

indicates that the ALJ provided due consideration to Plaintiff's assertions, testimony and medical record in order to determine Plaintiff's limitations and ability to work. (R. at 25-30.) This analysis included an extensive break down of every report that each treating physician provided after examining Plaintiff. (Id.) The ALJ noted that Plaintiff made statements regarding his pain and inability to work that were inconsistent with other statements that he made regarding the same. (R. at 26.) The ALJ also noted that some of Plaintiff's subjective claims were simply inconsistent with what the medical evidence suggested, thus justifying the ALJ to reject such evidence. (R. at 29-30.); See Burns, supra, at 129-30. Upon its own review of the record, the Court identified rather glaring inconsistencies regarding Plaintiff's claims as to his ability to work. For instance, in May 2012, Plaintiff informed Dr. Goldberg that he was terminated from his most recent job because of DYFS requirements that caused Plaintiff to take too much time off from work. (R. at 356.) Yet, in the July 2012 Disability Report, contrary to Plaintiff's prior assertions to Dr. Goldberg, Plaintiff reported that he stopped working because he "was terminated because [he] cannot read and write." (R. at 264-69.)

For these reasons, the Court finds that substantial evidence supports the ALJ's credibility findings. (R. at 30.)

**D. Substantial evidence supports the ALJ's determination that the Third-Party Report of plaintiff's wife was entitled to little weight**

At step four, the ALJ gave little weight to Plaintiff's wife's Third Party Function Report for various reasons, including the fact that it "[did] not outweigh the accumulated medical evidence regarding the extent to which the [Plaintiff's] impairments limit his functional abilities. (R. at 30.) The ALJ also stated that the report was "not persuasive for the same reasons set forth. . . in finding [Plaintiff's] allegations less than credible. (Id.)

Plaintiff argues that the ALJ erred in assigning little weight to his wife's Third Party Function report because "SSR 06-03p requires evidence from non-medical sources . . . such as spouses. . . whether the evidence is evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." (Pl. Br. at 28.) Plaintiff further contends that his wife's statements are not merely lay opinion because they are supported by the medical record. (Id.)

Social Security Ruling 06-03-p provides that an ALJ should consider "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence" when evaluating evidence from non-medical sources such as family or friends. See also Zirnsak v. Colvin, 777 F.3d

607, 612 (3d Cir. 2014). However, in order to properly evaluate
such factors, ALJ's must make certain credibility
determinations. (Id.)

Here, the ALJ determined that Plaintiff's wife's Third
Party Function report was merely lay opinion that corroborated
Plaintiff's allegations and resulting limitations. (R. at 30.)
Though Plaintiff asserts that his wife's statements are
supported by the medical record, as noted in great detail above,
the ALJ disagreed.   , the ALJ did not find Plaintiff's
statements regarding his allegations and resulting limitations
to be credible. The Court finds that the ALJ provided sufficient
reasoning in making this determination. Therefore, for much of
the same reasons listed in the previous section, the Court finds
that substantial evidence supports the ALJ's finding that
Plaintiff's wife's Third Party Function Report was entitled to
little weight. (R. at 30.)

**E. Substantial evidence supports the ALJ's decision to
accord substantial weight to Dr. Coffey's consultative
examination report.**

At step four, the ALJ decided to "accord significant weight
to Dr. Coffey's opinion, as it is consistent with the evidence
of record, including [Plaintiff's] good work history." (R. at
29.) Following the October 2013 mental status examination, Dr.
Coffey made the following findings: that Plaintiff possessed an

adequate understanding and memory, but limited concentration; that Plaintiff was able to respond to changes in a normal routine and work independently; that Plaintiff was capable of understanding and remembering short, simple instructions and making simple work related decisions; and that Plaintiff had the adequate ability to adapt to changes in the work environment, handle work stress and maintain social interaction. (R. at 379.)

Plaintiff contends that "the ALJ erred in according great weight to the consultative report of Dr. Coffey," because Dr. Coffey's conclusion that Plaintiff "did not meet criteria for a major mental disorder that would interfere with his capacity to work" is inconsistent with the doctor's own findings and other evidence in the record. (Pl. Br. at 29.) Specifically, Plaintiff directs the Court's attention to aspects of Dr. Coffey's examination that highlighted some of Plaintiff's weaknesses, such as his relatively low full-scale IQ, the fact that his wife had to complete forms for him, and the fact that his intelligence was estimated in the "mentally deficient range." (R. at 380.) Additionally, Plaintiff argues that Dr. Coffey's conclusion is inconsistent with the 2012 results of the examination by Dr. Goldberg, who rendered an Axis I diagnosis of learning disorder – reading. (Pl. Br. at 29.)

Again, this Court "may not weigh the evidence or substitute its own conclusions for those of the ALJ." Chandler, supra, at

359. The Court finds that the ALJ considered the reports of every doctor who examined the Plaintiff's mental status, particularly as it related to Plaintiff's ability to work. (R. at 29-30.) Though each doctor noted Plaintiff's inability to read and his relatively low IQ, each doctor also opined that Plaintiff's areas of strength and good work history were indicative of Plaintiff's ability to work and hold a job. These medical opinions were also consistent with the vocational expert's testimony that Plaintiff's ability to perform a significant number of jobs in the national economy would not be impacted by his learning disability, particularly his inability to read. (R. at 91-93.) Further, Plaintiff does not identify any document in the record wherein a doctor opined that Plaintiff's intellectual disability rendered him unable to work. Therefore, the Court rejects Plaintiff's argument that Dr. Coffey's medical opinion and the ALJ's finding are inconsistent with substantial evidence in the record.

To the contrary, the Court finds that substantial evidence supports the ALJ's determination that Dr. Coffey's examination report was entitled to significant weight. (R. at 29.)

**V. CONCLUSION**

For all of these reasons, the Court finds that substantial evidence supports the ALJ's decision to deny Plaintiff benefits,

and that it should be affirmed.  An accompanying Order will be

entered.


__September 25, 2017__                        __s/ Jerome B. Simandle__
Date                                        JEROME B. SIMANDLE
                                           U.S. District Judge